QUINN EMANUEL URQUHART & SULLIVAN, LLP
  David Eiseman (Bar No. 114758)
  davideiseman@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Ryan S. Goldstein (Bar No. 208444)
  ryangoldstein@quinnemanuel.com
865 S. Figueroa St., Floor 10
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Jared W. Newton (admitted *pro hac vice*)
  jarednewton@quinnemanuel.com
  K. Kevin Chu (admitted *pro hac vice*)
  kevinchu@quinnemanuel.com
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:    (202) 538-8000
Facsimile:    (202) 538-8100

MINAMINO LAW OFFICE, PLLC
  Koichiro Minamino (admitted *pro hac vice*)
  mick@minaminolaw.com
1300 I Street, NW
Washington, D.C. 20005
Telephone:    (202) 777-3638

Attorneys for Defendants
HAMAMATSU CORPORATION,
HAMAMATSU PHOTONICS K.K., and
PHOTONICS MANAGEMENT CORP.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEMICAPS PTE LTD., <br><br> Plaintiff, <br><br> vs. <br><br> HAMAMATSU CORPORATION, et al., <br><br> Defendants. | CASE NO. 17-cv-03440-DMR <br><br> **DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(6)** <br><br> Date: June 27, 2019 <br> Time: 11:00 a.m. <br> Courtroom: 4 <br> Judge: Honorable Donna M. Ryu |

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on June 27, 2019, at 11:00 a.m., or such other time as ordered by the Court, located at 1301 Clay Street, Oakland, CA 94612, Defendants Hamamatsu Corporation, Hamamatsu Photonics K.K., and Photonics Management Corp. (collectively, "Hamamatsu") will respectfully move the Court to dismiss the complaint filed in this case by Plaintiff SEMICAPS Pte Ltd. ("SEMICAPS") pursuant to Federal Rule of Civil Procedure 12(b)(6).

The complaint should be dismissed with prejudice because the asserted claims of U.S. Patent No. 7,623,982 (the "'982 patent") are invalid under 35 U.S.C. § 101 for claiming patent-ineligible subject matter .  Specifically, the claims are drawn to the patent-ineligible abstract idea of collecting multiple data samples and using the data to generate a test result, and the claims do not contain an inventive concept beyond this abstract idea.  Hamamatsu's Motion will be based on this Notice, the Memorandum of Points and Authorities set forth immediately below, and any information of which the Court may take judicial notice.

## STATEMENT OF ISSUES TO BE DECIDED

Whether SEMICAPS's complaint fails to state a claim upon which relief can be granted because the asserted claims of '982 patent are invalid under 35 U.S.C. § 101 for claiming patent-ineligible subject matter.

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................... 2

    A.   The Specification of the '982 Patent Identifies the Alleged Invention as Determining and Accumulating a Plurality of Data Samples and Using Them to Generate a Test Result ........................................................................ 2

    B.   The Asserted Claims of the '982 Patent Are Directed to the Abstract Idea of Determining and Accumulating a Plurality of Data Samples and Using Them to Generate a Test Result ................................................................. 4

    C.   The Prosecution History of the '982 Patent Shows that the Only Distinction Between the Claims and the Prior Art Is the Abstract Idea of Determining and Accumulating a Plurality of Data Samples ........................................... 5

III. LEGAL STANDARDS ............................................................................................ 6

    A.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) ...................... 6

    B.   Patent Eligible Subject Matter Under 35 U.S.C. § 101 ............................................. 7

IV.  ARGUMENT .......................................................................................................... 9

    A.   *Alice* Step 1: The Asserted Claims of the '982 Patent Are Directed to the Abstract Idea of Accumulating Data and Processing it to Generate a Test Result ...................................................................................................................... 9

        1.   The Focus and Character of the Claims Is an Abstract Idea ........................ 9

        2.   The Claims Do Not Describe Any Improvement to the Operation of a Computer or Other Hardware .................................................................. 12

        3.   The Specification and Prosecution History Confirm that the Asserted Claims Are Directed to an Abstract Idea, Not an Improvement in Hardware or Computer Functionality .............................. 14

    B.   *Alice* Step 2: The Asserted Claims of the '982 Patent Do Not Contain Any Inventive Concept Beyond the Abstract Idea of Accumulating Data and Using It to Generate a Test Result ........................................................................ 15

        1.   Limiting the Claims to a Technological Environment Does Not Add an Inventive Concept ................................................................................. 15

        2.   Accumulating and Processing a Plurality of Data Samples Does Not Add an Inventive Concept .................................................................. 15

        3.   Conventional Computer and Hardware Components Do Not Add an Inventive Concept .................................................................................. 16

V.   CONCLUSION ...................................................................................................... 17

# TABLE OF AUTHORITIES

Page

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ............................................................................. 7

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) ................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 6

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ............................................................................................ 15

*Cisco Sys., Inc. v. Uniloc USA, Inc.*,
  No. 18-cv-04991-SI, 2019 WL 1995334 (N.D. Cal. May 6, 2019) ........................... 7

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017) ......................................................................... 6-7

*CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*,
  916 F.3d 1350 (Fed. Cir. 2019) ............................................................................ 7

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ............................................................................ 9

*Diamond v. Diehr*,
  450 U.S. 175 (1981) ............................................................................................ 14

*Electric Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ..................................................................... *passim*

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ..................................................................... 12, 13

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
  839 F.3d 1089 (Fed. Cir. 2016) ............................................................... 1-2, 8-9

*Genetic Techs. Ltd. v. Merial L.L.C.*,
  818 F.3d 1369 (Fed. Cir. 2016) ............................................................................ 6

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .............................................................................. 6

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015) .......................................................................... 16

*Mayo Collaborative Servs.  v. Prometheus Labs., Inc.*,
  566 U.S. 66 (2012) ................................................................................................ 8

*MGIC Indem. Corp. v. Weisman*,
  803 F.2d 500 (9th Cir. 1986) ................................................................................ 7

*OpenTV, Inc. v. Apple Inc.*,
   No. 5:15-cv-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ........................................ 7

*PUREPREDICTIVE, Inc. v. H2O.AI, Inc.*,
   No. 17-cv-03049-WHO, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017),
   *aff'd*, 741 F. App'x 802 (Fed. Cir. 2018) .................................................................................... 7

*RingCentral, Inc. v. Dialpad, Inc.*,
   No. 18-cv-05242-JST, 2019 WL 1102986 (N.D. Cal. Mar. 8, 2019) ........................................ 7

*SAP Amer., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) .................................................................................................. 7

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
   873 F.3d 1364 (Fed. Cir. 2017) .................................................................................................. 9

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ........................................................................................... *passim*

*TS Patents LLC v. Yahoo! Inc.*,
   279 F. Supp. 3d 968 (N.D. Cal. 2017),
   *aff'd*, 731 F. App'x 978 (Fed. Cir. 2018) .................................................................................... 7

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) .................................................................................................. 9

*Usher v. City of Los Angeles*,
   828 F.2d 556 (9th Cir. 1987) ...................................................................................................... 6

## Statutes

35 U.S.C. § 101 .................................................................................................................... *passim*

## Rules and Regulations

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Section 101 of the Patent Act defines specific categories of subject matter eligible for patent protection.  It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  "Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work," and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws."  *Id*. (internal quotations and formatting omitted).

The *Alice* decision endorsed a two-step framework to determine whether a patent claim falls outside of § 101.  *See Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).  The first step considers whether the "focus" or "character" of the claim is directed to one of the patent-ineligible exceptions, such as an abstract idea.  *Id*.  If so, the second step considers whether the claim recites elements that, alone or in combination, provide an "inventive concept" that transforms the abstract idea into a patent-eligible application.  *Id*.

Applying this framework, the Federal Circuit has repeatedly held that patent claims directed to collecting and processing data are abstract ideas that fall outside of § 101, and that implementing the abstract idea in a specific technological environment or with conventional hardware does not transform the idea into a patent-eligible application.  In *Electric Power*, the Federal Circuit held that claims directed to collecting data from a power grid, analyzing the data to generate performance metrics, and displaying the performance metrics were invalid under § 101.  *Id*. at 1353-55.  The Federal Circuit reached the same conclusion in *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016) for patent claims directed to acquiring and processing image data using an embedded camera in a mobile telephone.  And in *FairWarning IP, LLC v.*

1   *Iatric Sys., Inc.*, 839 F.3d 1089 (Fed. Cir. 2016), the Federal Circuit invalidated claims directed to

2   collecting data about access to health records and analyzing the data to detect improper accesses.

3        The patent claims at issue in this case are directed to the same type of patent-ineligible

4   subject matter.  They describe the abstract idea of "determining" and "accumulating" a plurality of

5   data samples from an electronic circuit, and processing the data samples to "generate a value" and

6   a "test result."  The claims do not recite any elements that, alone or in combination, transform this

7   abstract idea into a patent-eligible application.  They simply implement the abstract idea in the

8   known technological environment of testing electronic circuits, using conventional hardware like a

9   laser, control system, measuring circuit, and signal processor.  Under the two-step framework in

10  *Alice*, the claims are invalid because they fall outside of § 101, and SEMICAPS's complaint

11  should be dismissed with prejudice for failure to state a claim on which relief can be granted.

12  **II.**    **FACTUAL BACKGROUND**

13      **A.**    **The Specification of the '982 Patent Identifies the Alleged Invention as**
            **Determining and Accumulating a Plurality of Data Samples and Using Them**

14              **to Generate a Test Result**

15       The '982 patent is titled "Method of Testing an Electronic Circuit and Apparatus Thereof."

16  Dkt. No. 1-1 (the '982 patent ).  The patent is in the field of testing electronic circuits to determine

17  the location of a defect or fault.  *Id.* at 1:6-8.  The patent focuses on a class of techniques known as

18  "laser-induced" testing, which involves focusing a laser beam on a specific location of an

19  electronic circuit and measuring the change in current or voltage supplied to the circuit.  *Id.* at

20  1:11-26.  A significant change may indicate the presence of a defect at the location where the laser

21  beam is focused.  *Id.*  The '982 patent admits that laser-induced testing techniques were well

22  known in the prior art, and identifies several example techniques including Optical Beam Induced

23  Resistance Change ("OBIRCH"), Thermal Induced Voltage Alteration ("TIVA"), Thermal Beam

24  Induced Phenomenon ("TBIP"), Externally Induced Voltage Alteration ("XIVA") and Differential

25  Resistance Measurement ("DReM").  *Id.*

26       The alleged invention of the '982 patent is not a new or novel laser-induced testing

27  technique; rather, the patent is directed to improving the "detection sensitivity" of conventional

28  techniques that were already known in the prior art.  *Id.* at 1:34-37 ("[I]n order for these

1    conventional laser induced techniques to remain effective . . . an improvement in their detection

2    sensitivity is needed.").  The patent explains that improved detection sensitivity was necessary

3    because electronic circuits at the time were designed with more metallization layers and low-

4    conductivity dielectric materials.  *Id*. at 1:28-33 ("[W]ith the advancement of integrated circuit

5    technology which has typically involved the use of more metallization layers and new low k inter-

6    layer dielectric materials with lower thermal conductivity, the laser coupling efficiency is reduced.

7    As a result, the detection sensitivity of these conventional laser induced techniques is also

8    reduced.").  The patent then characterizes prior attempts to improve detection sensitivity as

9    ineffective.  *Id*. at 1:38-67.  These prior attempts focused on hardware modifications, such as

10   increasing the laser intensity or using the laser in combination with a lock-in amplifier.  *Id*.

11   According to the patent, however, these modifications were undesirable because they risked

12   damaging the test circuit and required finely tuned calibration of the lock-in amplifier, which is

13   "difficult to achieve in practice" and thus "not used in a real-time integrated circuit testing

14   environment."  *Id*.

15          Rather than proposing a new hardware modification, the '982 patent aims to improve

16   detection sensitivity simply by collecting more data from the circuit being tested.  *Id*. at 2:3-10.

17   The patent describes the invention as "determining a ***plurality of samples*** of a response signal

18   output by the electronic circuit," "accumulating the ***plurality of samples*** to generate a value," and

19   "generating a ***test result*** based on the value."  *Id*. (emphasis added).  The patent also describes

20   generic hardware components used to implement these method steps—including a laser beam

21   source, control system, measuring circuit, and signal processor—but the patent does not propose

22   any modifications or improvements to these generic hardware components.  *Id*. at 2:11-22.  In fact,

23   the patent admits that the components were conventional features of laser-induced testing systems

24   known in the prior art, and cites U.S. Patent No. 6,897,664 as an example prior-art system that

25   includes each of the components.  *Id*. at 1:12-15, 3:36-48; Ex. 2 (U.S. Patent No. 6,897,664) at

26   3:5-23, Fig. 1.[1]  The only distinction the '982 patent makes over these prior-art systems is the

27   _____

28          [1]  Exhibit numbers refer to the Declaration of K. Kevin Chu submitted with this motion.

concept of collecting a plurality of data samples and using them to generate a test result. Dkt. No. 1-1 at 2:11-22.

**B.      The Asserted Claims of the '982 Patent Are Directed to the Abstract Idea of Determining and Accumulating a Plurality of Data Samples and Using Them to Generate a Test Result**

SEMICAPS's complaint alleges that Hamamatsu infringes claims 4-7 and 21-25 of the '982 patent. Dkt. No. 1, ¶ 13. Claims 4-7 depend from independent claim 1, which recites a method for testing an electronic circuit that includes the steps of "determining a plurality of samples of a response signal," "accumulating the plurality of samples to generate a value," and "generating a test result based on the value." Dkt. No. 1-1 at 10:59-67, 11:8-18. Claim 1 is reproduced below:

1. A method of testing an electronic circuit, comprising:

   radiating a laser beam onto the electronic circuit,

   determining a plurality of samples of a response signal output by the electronic circuit during the period when the laser beam is radiated,

   accumulating the plurality of samples to generate a value, and

   generating a test result based on the value.

*Id*. at 10:59-67.

Claim 4 depends from claim 1 and specifies that the laser beam is a pulsed laser beam. *Id*. at 11:8-9. Claims 5-7 depend from claim 4 and describe frequencies for pulsing the laser beam and accumulating the data samples. *Id*. at 11:10-18.

Independent claim 21 is directed to an apparatus that includes hardware components to perform the same steps as claim 1, *i.e.*, "determin[ing] a plurality of samples of a response signal," "accumulat[ing] the plurality of samples to generate a value," and "generat[ing] a test result based on the value." Dkt. 1-1 at 12:19-31. Claim 21 is reproduced below:

21. An apparatus, comprising:

   a laser beam source, wherein the laser beam source radiates a laser beam onto the electronic circuit,

   a control system operable to direct the laser beam source to dwell on a location on the electronic circuit,

1

> a measuring circuit, wherein the measuring circuit determines a plurality
> of samples of a response signal output by the electronic circuit during the
> period when the laser beam is radiated, and

2

3

> a signal processor, wherein the signal processor accumulates the plurality
> of samples to generate a value, and generates a test result based on the
> value.

4

5   *Id*. at 12:19-31.

6   Claims 22-25 depend from claim 21.  *Id*. at 12:32-43.  Claim 22 explains that the control

7   system is operable to move the laser in a pattern over the electronic circuit.  *Id*.  Claim 23, like

8   claim 4, specifies that the laser beam source is a pulsed laser beam.  *Id*.  And claims 24 and 25,

9   like claims 5-7, describe frequencies for radiating the laser beam and accumulating the data

10  samples.  *Id*.

11  **C.    The Prosecution History of the '982 Patent Shows that the Only Distinction
         Between the Claims and the Prior Art Is the Abstract Idea of Determining and
         Accumulating a Plurality of Data Samples**

12

13  During prosecution of the application underlying the '982 patent, the inventors relied

14  solely on the concept of determining and accumulating a plurality of data samples in order to

15  distinguish their alleged invention from the prior art.  The application underlying the '982 patent

16  was filed on November 5, 2007.  Dkt. No. 1-1.  On February 19, 2009, the examiner issued an

17  Office Action finding claims 1-25 invalid as anticipated by U.S. Patent No. 7,019,311 to Horn.

18  *See* Ex. 1 at 60-68.  The inventors responded to the Office Action on May 19, 2009, and argued

19  that the Horn reference did not anticipate the pending claims because it disclosed accumulating

20  only a single data sample, not a plurality of samples:

21

> Horn fails to provide any basis for a feature of "determining <u>a plurality of samples</u>
> of a response signal output," or a feature of "accumulating the plurality of
> samples to generate a value," as required by applicants' claim 1.  Contrariwise,
> Horn teaches to process <u>one charge collection signal</u> for each spatial locations . . .
> .  Based on the foregoing, claim 1 is differentiated from, and thus not anticipated
> by, Horn.

22

23

24

25  *Id*. at 88 (emphasis in original).

26  The inventors repeated the same arguments with respect to apparatus claims 21-25.  *Id*. at

27  89-90.  Notably, they did ***not*** argue that the computer and hardware components of these claims

28  distinguished them from the prior art:

1
2
3

> Consistent with the remarks in the preceding sub-section hereof, Horn fails to provide any basis for circuitry or any other components that "determines <u>a</u> <u>plurality of samples</u> of <u>a</u> response signal output," or a signal processor that accumulates the plurality of samples of the same response signal to generate a value, as required by applicants' claim 21.

4   *Id*. at 89 (emphasis in original).

5   In light of the inventors' arguments regarding the Horn reference, the examiner withdrew

6   his rejections and allowed the pending claims.  *Id*. at 109-15.  In his Notice of Allowance, the

7   examiner agreed with the applicants that the concept of determining and accumulating a plurality

8   of data samples distinguished the claims over the prior art:

9
10
11
12

> The main reason for the allowance of <u>claims 1 and 21</u> is the inclusion of the limitation "…determining a plurality of samples of a response signal output by the electronic circuit during the period when the laser beam is radiated, accumulating the plurality of samples to generate a value, and generating a test result based on the value," claim 21 is an apparatus claim and has similar limitation.

13   *Id*. at 113-14 (emphasis and ellipsis in original).

14   **III.     LEGAL STANDARDS**

15   **A.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

16   Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

17   if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion, the

18   plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*

19   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In determining whether the plaintiff has stated a

20   claim upon which relief can be granted, the plaintiff's factual allegations are accepted as true.  *See*

21   *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court is not

22   required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact,

23   or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008).

24   The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper

25   to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."  *Genetic Techs.*

26   *Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016); *see also Cleveland Clinic Found. v.*

27   *True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly

28   affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant

1   discovery has commenced.").  This is because patent eligibility under § 101 is a question of law,

2   and resolution is appropriate where, as in this case, there are no factual allegations in the

3   complaint that create a contested underlying issue of fact.  *See Aatrix Software, Inc. v. Green*

4   *Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *SAP Amer., Inc. v. InvestPic, LLC*,

5   898 F.3d 1161, 1166 (Fed. Cir. 2018).  In that situation, the issue may be decided on undisputed

6   facts from the claims, specification, and prosecution history.  *See id.*[2]  Consistent with this

7   precedent, courts in the Northern District of California have routinely granted motions to dismiss

8   on the grounds that the asserted patents are invalid under § 101.  *See, e.g.*, *Cisco Sys., Inc. v.*

9   *Uniloc USA, Inc.*, No. 18-cv-04991-SI, 2019 WL 1995334, at *12 (N.D. Cal. May 6, 2019);

10  *RingCentral, Inc. v. Dialpad, Inc.*, No. 18-cv-05242-JST, 2019 WL 1102986, at *2 (N.D. Cal.

11  Mar. 8, 2019); *TS Patents LLC v. Yahoo! Inc.*, 279 F. Supp. 3d 968, 1001 (N.D. Cal. 2017), *aff'd*,

12  731 F. App'x 978 (Fed. Cir. 2018); *PUREPREDICTIVE, Inc. v. H2O.AI, Inc.*, No. 17-cv-03049-

13  WHO, 2017 WL 3721480, at *7 (N.D. Cal. Aug. 29, 2017), *aff'd*, 741 F. App'x 802 (Fed. Cir.

14  2018); *OpenTV, Inc. v. Apple Inc.*, No. 5:15-cv-02008-EJD, 2016 WL 344845, at *10 (N.D. Cal.

15  Jan. 28, 2016).

16          **B.      Patent Eligible Subject Matter Under 35 U.S.C. § 101**

17          Section 101 defines patent eligible subject matter as "any new and useful process,

18  machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35

19  U.S.C. § 101.  The Supreme Court has "long held that this provision contains an important

20  implicit exception:  Laws of nature, natural phenomena, and abstract ideas are not patentable."

21  *Alice*, 573 U.S. at 216.  "Laws of nature, natural phenomena, and abstract ideas are the basic tools

22

23          [2]  The Court may take judicial notice of the prosecution history and other matters of public
24  record in evaluating a motion to dismiss, such as the '664 patent discussed in Section II.A above.
    *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("On a motion to dismiss,
25  we may take judicial notice of matters of public record outside the pleadings."); *see also CODA
    Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019) (explaining
26  that a court may take judicial notice of facts outside of the pleadings on a 12(b)(6) motion to
    dismiss, provided the facts are not subject to "reasonable dispute"); *Aatrix*, 882 F.3d at 1128
27  (discussing "sources properly considered on a motion to dismiss, such as the complaint, the patent,
    and materials subject to judicial notice").
28

1    of scientific and technological work," and "monopolization of those tools through the grant of a

2    patent might tend to impede innovation more than it would tend to promote it, thereby thwarting

3    the primary object of the patent laws." *Id*. (internal quotations and formatting omitted).  "The

4    Supreme Court, setting up a two-stage framework, has held that a claim falls outside § 101 where

5    (1) it is directed to a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or

6    abstract idea, and (2), if so, the particular elements of the claim, considered both individually and

7    as an ordered combination, do not add enough to transform the nature of the claim into a patent-

8    eligible application." *Electric Power*, 830 F.3d at 1353 (internal quotations omitted) (citing *Alice*,

9    573 U.S. at 216).

10        The first step of the *Alice* framework considers the "focus" of the claims and their

11    "character as a whole" to determine whether they are directed to an abstract idea, law of nature, or

12    natural phenomena.  *Electric Power*, 830 F.3d at 1353.  If they are, then the second step is to

13    "search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to

14    ensure that the patent in practice amounts to significantly more than a patent upon the ineligible

15    concept itself."  *Alice*, 573 U.S. at 217-18 (internal formatting omitted).  The inventive concept

16    must be more than "well-understood, routine, conventional activity."  *Mayo Collaborative Servs.*

17    *v. Prometheus Labs., Inc.*, 566 U.S. 66, 132 (2012).  It cannot simply amount to implementing the

18    abstract idea in a known technological environment.  *See Electric Power*, 830 F.3d at 1354-55

19    ("Most obviously, limiting the claims to the particular technological environment of power-grid

20    monitoring is, without more, insufficient to transform them into patent-eligible applications of the

21    abstract idea at their core.").  Nor can it amount to implementing the abstract idea using

22    conventional hardware.  *See TLI*, 823 F.3d at 613 ("We agree with the district court that the

23    claims' recitation of a 'telephone unit,' a 'server,' an 'image analysis unit,' and a 'control unit' fail

24    to add an inventive concept sufficient to bring the abstract idea into the realm of patentability.").

25        Following *Alice*, the Federal Circuit has invalidated numerous patents directed to the

26    abstract idea of collecting and processing data.  *See*, *e.g.*, *Electric Power*, 830 F.3d at 1353-55

27    (claims directed to collecting data from a power grid, analyzing the data to generate performance

28    metrics, and displaying the performance metrics); *TLI*, 823 F.3d at 611-12 (claims directed to

1   acquiring and processing image data using an embedded camera in a mobile telephone);

2   *FairWarning IP*, 839 F.3d at 1093-96 (claims directed to collecting data about access to health

3   records and analyzing the data to detect improper accesses); *Two-Way Media Ltd. v. Comcast*

4   *Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (claims directed to converting,

5   routing, controlling, monitoring, and accumulating records); *Content Extraction and Transmission*

6   *LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claims directed to

7   collecting data, recognizing certain data within the collected set, and storing that data); *Smart Sys.*

8   *Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1371-72 (Fed. Cir. 2017) (claims

9   directed to acquiring identification data from a bankcard, using the data to verify if the bankcard is

10  valid, and denying access if the bankcard is invalid).  The asserted claims of the '982 patent—

11  which were submitted to the Patent Office before the *Alice* decision—are directed to the same type

12  of abstract idea.

13  **IV.   ARGUMENT**

14   The asserted claims of the '982 patent are directed to the abstract idea of accumulating a

15  plurality of data samples and using them to generate a test result.  The claims do not recite any

16  inventive concept that transforms this abstract idea into a patent-eligible application; they simply

17  implement the idea in a known technological environment using conventional hardware.  Under

18  the two-step *Alice* framework, the claims fall outside of § 101 and are invalid.

19   **A.   *Alice* Step 1: The Asserted Claims of the '982 Patent Are Directed to the**
     **Abstract Idea of Accumulating Data and Processing it to Generate a Test**
20   **Result**

21   **1.   The Focus and Character of the Claims Is an Abstract Idea**

22   The first step of the *Alice* framework considers the "focus" of the claims or their "character

23  as a whole."  *Electric Power*, 830 F.3d at 1353.  The focus and character of the '982 patent claims

24  is collecting data and processing it to generate a test result.  Claim 1 recites a "method for testing

25  an electronic circuit."  Dkt. No. 1-1 at 10:60-67.  The method includes the step of radiating the

26  circuit with a laser beam as an input and then "determining a plurality of data samples of a

27  response signal" as an output.  *Id*.  The remaining steps require "accumulating the plurality of data

28  samples to generate a value" and "generating a test result based on the value."  *Id*.  Taken together,

these steps describe collecting data from the circuit being testing and processing the data to arrive at a test result.  *Id*.  Claims 4-7, which depend from claim 1, specify frequencies for pulsing the laser beam and sampling the response signal.  *Id*. at 11:8-18.  These limitations describe the input and output of the claimed method, but they do not change its focus or overall character of collecting and processing data to generate a test result.  *Id*. at 11:8-18.

The Federal Circuit has held that claims directed to collecting data and processing it to generate a result are abstract ideas under *Alice* step one.  *Electric Power*, 830 F.3d at 1353-54.  In *Electric Power*, the claims recited a method of detecting events on an interconnected electric power grid.  *Id*. at 1351-52.  The method included the steps of, *inter alia*, receiving input data that includes measurements from multiple points in the power grid, detecting and analyzing the measurements to derive various metrics about the power grid, and using metrics to derive an "indicator" that represents the power grid's vulnerability.  *Id*.  Analyzing the claims, the Federal Circuit explained that the "focus" was "collecting information, analyzing it, and displaying certain results of the collection and analysis."  *Id*. at 1353.

The Federal Circuit then walked through its precedent under § 101 to explain why these concepts amount to nothing more than an abstract idea.  *Id*. at 1353-54.  First, it explained that "we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas."  *Id*. at 1353.  Second, it explained that "we have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category."  *Id*. at 1354.  Third, it explained that "we have recognized that merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis."  *Id*.  It then concluded that "the claims are clearly focused on the combination of those abstract-idea processes.  The advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions.  They are therefore directed to an abstract idea."  *Id*.

1    The same rationale applies to the claims of the '982 patent.  Just like the claims in *Electric*

2   *Power* were directed to receiving information in the form of "measurements," the claims of '982

3   patent are directed to collecting data in the form of "samples."  Like the claims in *Electric Power*

4   were directed to analyzing the measurements to derive "metrics," the claims of the '982 patent are

5   directed to accumulating the samples to derive a "value."  And like the claims in *Electric Power*

6   were directed to using the metrics to derive an "indicator," the claims of the '982 patent are

7   directed to using the value to generating a "test result."  The focus and character of the '982 patent

8   claims, therefore, is collecting and processing information to generate a test result, which is

9   nothing more than an abstract idea under *Alice* step one.  *Electric Power*, 830 F.3d at 1354.

10   The recitation of hardware and computer components in asserted claim 21 does not change

11   this result.  As discussed in Section II.B above, claim 21 describes an apparatus that includes a

12   "laser beam source," "control system," "measuring circuit," and "signal processor."  Dkt. No. 1-1

13   at 12:19-31.  The '982 patent admits that these components were well known in the prior art and

14   standard features of conventional laser-induced testing systems.  *Id.* at 1:12-15, 3:36-48.  In

15   particular, the patent explains that conventional techniques used a scanning microscope that had a

16   built in laser beam source and control system, along with a lock-in amplifier that acted as a signal

17   processor.  *Id.* at 1:38-67.  The patent also discusses U.S. Patent No. 6,897,664, which was filed

18   five years before the '982 patent and describes a prior-art laser-induced testing system with the

19   same standard components:  a pulsed laser beam, control system, measuring circuit, and signal

20   processor.  *Id.* at 3:36-48; Ex. 2 at 3:5-23, Fig. 1.

21   In the context of claim 21, these same standard components are used in a conventional

22   manner and serve only to implement the abstract idea of collecting data, processing that data, and

23   generating a test result.  Dkt. No. 1-1 at 12:19-31.  The laser beam source radiates the circuit; the

24   control system moves the laser; the measuring circuit "determines a plurality of samples of a

25   response signal;" and the signal processor "accumulates the plurality of samples to generate a

26   value" and "generate a test result."  *Id*.  Thus, the components are used "merely [as] a conduit for

27   the abstract idea," which does not change the focus or overall character of the claims.  *See TLI*,

28   823 F.3d at 612.

1        The *TLI* case is instructive in this regard.  There, the claims were directed to recording

2  image data using a "digital pickup unit" (*i.e.*, a camera) in a mobile phone, transmitting the data to

3  a server, and storing it on the server.  *Id*. at 610.  The Federal Circuit explained that the digital

4  pickup unit, mobile phone, and server "merely provide a generic environment in which to carry

5  out the abstract idea of classifying and storing digital images in an organized manner." *Id*. at 611.

6  They did not change the overall focus or character of the claims.  *Id*. at 611-12.  The same

7  rationale applies to claim 21 of the '982 patent.  The recited hardware and computer components

8  serve only as a conduit or generic environment for the abstract idea of accumulating data and

9  using it to generate a test result. Dkt. No. 1-1 at 12:19-31.  The focus of the claim is still directed

10  to this abstract idea.  *Id*.

11        Finally, the additional limitations of claims 22-25 do not change the focus or overall

12  character of the apparatus of claim 21.  Claims 22-25 depend from claim 21 and therefore

13  incorporate its limitations.  Claim 22 explains that the control system of claim 21 "is operable to

14  move the laser beam source according to a pattern over a plurality of locations on the electronic

15  circuit." *Id*. at 12:32-34.  This functionality simply allows the apparatus to collect and process

16  data from different locations on the circuit.  *Id*.  It does not alter the fundamental character of the

17  claims as focused on collecting and processing that data.  Claims 23-25, like claims 4-7 discussed

18  above, specify frequencies for pulsing the laser beam and sampling the response signal.  *Id*. at

19  12:35-43.  These limitations add detail about the input and output of the claimed apparatus, but

20  they do not change its focus or overall character of collecting and processing data.  *Id*.[3]

21            **2.     The Claims Do Not Describe Any Improvement to the Operation of a Computer or Other Hardware**

22

23        This case is distinct from *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016),

---

24       [3]  SEMICAPS recently asserted claims 8 and 17 in its Patent Local Rule 3-1 Disclosure. These claims were not asserted in the complaint, and therefore they are not part of the pleadings.

25  *See* Dkt. No. 1, ¶ 13.  Even if SEMICAPS had properly pled infringement of claims 8 and 17, they would still be subject to dismissal under § 101.  Claim 8 depends from claim 1 and simply

26  describes the timing of accumulating data samples relative to radiating the laser beam.  Dkt. No. 1-1 at 11:19-22.  Claim 17 also depends from claim 1 and simply describes accumulating another

27  plurality of data samples and using them to generate another test result.  *Id*. at 12:4-9.  Neither

28  claim changes the focus or overall character of collecting and processing data.

1   in which the Federal Circuit held that the asserted claims were directed to a specific improvement

2   in computer technology, rather than to the mere use of a computer to implement an abstract idea.

3   The *Enfish* claims described a novel self-referential database that allowed computers to store and

4   retrieve data in a more flexible fashion than prior art relational databases.  *Enfish*, 822 F.3d at

5   1330-33.  The Federal Circuit held that, because the claimed database improved how the computer

6   operated and executed its intended functionality, it was not an abstract idea under *Alice* step one.

7   *Id*. at 1336.

8         Following *Enfish*, the Federal Circuit has distinguished claims directed to an improvement

9   in computer or hardware technology from those that simply use a computer or hardware to

10   implement an abstract idea.  *See, e.g.*, *TLI*, 823 F.3d 612.  In *TLI*, for example, the Federal Circuit

11   distinguished *Enfish* and explained that the claimed invention had nothing to do with improving

12   the operation of a camera and mobile phone, or optimizing the structure of a server to store image

13   data.  *TLI*, 823 F.3d at 612.  The claims simply used these components to implement the abstract

14   idea of recording, classifying, and storing image data, which was not enough to pull the claims

15   within the patentable bounds of § 101.  *Id*.; *see also Electric Power*, 830 F.3d at 1354 ("The

16   present case is different [than *Enfish*]: the focus of the claims is not on such an improvement in

17   computers as tools, but on certain independently abstract ideas that use computers as tools.").

18         The claims of the '982 patent are like those in *TLI* and *Electric Power*, not *Enfish*.  The

19   claims do not describe any improvement in the operation of a computer or other hardware

20   components like the claimed laser, control system, measuring circuit, and signal processor.  Dkt.

21   No. 1-1 at 10:60-11:18, 12:19-43.  Instead, the claims use these components in a conventional

22   manner to implement the abstract idea of accumulating data samples and generating a test result.

23   *Id*. at 10:60-11:18, 12:19-43.  Again, the '982 patent admits that these same components were

24   used in conventional laser-induced testing systems.  *Id*. at 3:36-48; Ex. 2 at 3:5-23, Fig. 1.  Rather

25   than proposing modifications or improvements to the components, the claims simply use them in a

26   conventional manner to collect and process data.  *Id*. at 10:60-11:18, 12:19-43.  This is not enough

27

28

1  to render the claims non-abstract.  *TLI*, 823 F.3d at 612; *Electric Power*, 830 F.3d at 1354.[4]

2  **3.   The Specification and Prosecution History Confirm that the Asserted Claims Are Directed to an Abstract Idea, Not an Improvement in Hardware or Computer Functionality**

3

4        The specification and prosecution history of the '982 patent confirm that the only feature

5  the inventors relied on to distinguish the prior art was the abstract idea of accumulating data and

6  using it to generate a test result.  The specification includes a "Summary of the Invention" section

7  that emphasizes the steps of "determining plurality of samples of a response signal output by the

8  electronic circuit," "accumulating the plurality of samples to generate a value," and "generating a

9  test result based on the value."  Dkt. No. 1-1 at 2:1-10.  It does not describe any specific

10  improvement to hardware, and in fact distinguishes prior art solutions that relied on hardware

11  combinations such as the addition of a lock-in amplifier.  *Id*. at 1:38-67.  Accordingly, the

12  specification confirms that the claims are directed to an abstract idea.  *See TLI*, 823 F.3d at 611

13  ("[T]he specification's emphasis that the present invention 'relates to a method for recording,

14  communicating and administering [a] digital image' underscores that claim 17 is directed to an

15  abstract concept.") (formatting in original).

16        The prosecution history supports the same conclusion.  As discussed in Section II.C above,

17  the patent examiner initially rejected the claims based on the Horn reference.  Ex. 1 at 60-68.  In

18  response, the only limitation the inventors relied on to distinguish their claims from Horn was the

19  concept of "determining a plurality of samples" and "accumulating the plurality of samples to

20  generate a value."  *Id*. at 88.  The inventors did not identify any improvements to computer or

21  hardware components.  *Id*.  They simply argued that the claims required a plurality of data

22  samples, whereas Horn disclosed a single sample.  *Id*.  This record confirms that the focus and

23  overall character of the claims is directed to the abstract idea of accumulating data and using it to

24

25        4  For the same reason, the claims of the '982 patent are distinct from those at issue in *Diamond v. Diehr*, 450 U.S. 175 (1981).  The invention in *Diehr* used a mathematical formula

26  called the Arrhenius equation to calculate the optimal time to open a molding press that was used cure synthetic rubber.  *Id*. at 177-78.  The mathematical formula was used to improve the

27  operation of a machine by allowing it to cure rubber for the correct amount of time; the machine was not being used simply to implement a mathematical formula.  *Id*.

28

generate a test result, not an improvement in the operation of a computer or other hardware. *TLI*, 823 F.3d at 611-12.

**B.**  ***Alice* Step 2: The Asserted Claims of the '982 Patent Do Not Contain Any Inventive Concept Beyond the Abstract Idea of Accumulating Data and Using It to Generate a Test Result**

The second step of the *Alice* framework  is to "search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18 (internal formatting omitted).  The elements of the '982 patent claims, taken alone or together, do not provide an inventive concept that brings the overall invention within the scope of § 101.

**1.**  **Limiting the Claims to a Technological Environment Does Not Add an Inventive Concept**

The fact that the claims are directed to the field of electronic circuit testing does not add an inventive concept. *See Electric Power*, 830 F.3d at 1354.  In *Electric Power*, the Federal Circuit determined in *Alice* step one that the claims were directed to the abstract idea of gathering, analyzing, and displaying information. *Id*. at 1353-54.  Turning to *Alice* step 2, the court explained that limiting the abstract idea to the technological field of analyzing power grids did not add an inventive concept. *Id*. at 1354 ("Most obviously, limiting the claims to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core."); *see also Alice*, 573 U.S. at 222 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment.") (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)) (internal formatting omitted).  Applying this principle to the instant case, the claims of the '982 patent do not add an inventive concept by limiting the abstract idea of accumulating and processing data to the field of testing electronic circuits. *Id*.

**2.**  **Accumulating and Processing a Plurality of Data Samples Does Not Add an Inventive Concept**

The fact that the claims specify a "plurality of samples"—as opposed to a single sample—does not provide an inventive concept.  As an initial matter, this feature of the claims is part of the

overall abstract idea of accumulating and processing data.  Thus, it cannot provide an inventive

concept under *Alice* step two, which considers the remaining elements of the claims beyond the

abstract idea itself.  *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363

(Fed. Cir. 2015) ("[A]t a second step we ask whether the remaining elements, either in isolation or

combination with the non-patent-ineligible elements, are sufficient to transform the nature of the

claim into a patent-eligible application.") (internal quotations omitted).

Furthermore, even if the idea of accumulating and processing a plurality of data samples is

considered at *Alice* step two, it does not constitute an inventive concept under the Federal Circuit's

reasoning in *Electric Power*.  There, the claims described collecting and analyzing information

from multiple sources, including sources located within and external to the power grid.  *Electric

Power*, 830 F.3d at 1354 ("[A] large portion of the lengthy claims is devoted to enumerating types

of information and information sources available within the power-grid environment."); *see also

id.* at 1351-52 (listing sources of information).  The Federal Circuit held that simply using more or

better information did not add an inventive concept that would render the claims any less abstract.

*Id.* at 1354 ("But merely selecting information, by content or source, for collection, analysis, and

display does nothing significant to differentiate a process from ordinary mental processes, whose

implicit exclusion from § 101 undergirds the information-based category of abstract ideas.").

The same rationale applies to the claims of the '982 patent.  The idea of accumulating and

processing a plurality of data samples does not add an inventive concept because it is no less

abstract than the idea of accumulating and processing a single sample.  Both ideas fall within the

"information-based category of abstract ideas" that are excluded from § 101.  *Id.*

### 3.  Conventional Computer and Hardware Components Do Not Add an Inventive Concept

The fact that certain claims of the '982 patent recite computer and hardware components

like a laser beam source, control system, measuring circuit, and signal processor is not enough to

provide an inventive concept under *Alice* step two.  *See TLI*, 823 F.3d at 613.  As discussed in

Section IV.A.2 above, all of these components were known in the prior art and used in

conventional laser-induced testing techniques.  The '982 patent explains that conventional

techniques used a scanning microscope with a built-in laser beam source and control system, along with a lock-in amplifier to act as a signal processor.  Dkt. No. 1-1 at 1:12-15, 1:38-67.  The patent also identifies a prior-art laser-induced testing system in U.S. Patent No. 6,897,664, which includes a pulsed laser beam source, a moveable control system, a measuring circuit, and a signal processor.  *Id.* at 3:36-48; Ex. 2 at 3:5-23, 4:10-23, Fig. 1.[5]

Not surprisingly, the '982 patent does not identify any of these computer and hardware components as new or novel aspects of the alleged invention.  Nor does it state that the components are used in a non-conventional manner.  As discussed in Section IV.A.2 above, the '982 patent uses these components only as a conduit for the abstract idea of the accumulating and processing data samples.  That is not enough to provide an inventive concept under *Alice* step two. *TLI*, 823 F.3d at 613 ("We agree with the district court that the claims' recitation of a 'telephone unit,' a 'server,' an 'image analysis unit,' and a 'control unit' fail to add an inventive concept sufficient to bring the abstract idea into the realm of patentability."); *Electric Power*, 830 F.3d at 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information.").

## V.   CONCLUSION

The asserted claims of the '982 patent are directed to the abstract idea of accumulating a plurality of data samples and processing them to generate a test result.  The remaining elements of the claims do not add an inventive concept that transform the abstract idea into a patent-eligible application.  Thus, the claims fall outside the scope of § 101 and are invalid.  Hamamatsu, therefore, respectfully requests that the Court grant its motion to dismiss for failure to state a claim on which relief can be granted and dismiss SEMICAPS's complaint with prejudice.

---

[5]   The prosecution history of the '982 patent confirms that a laser beam source, control system, measurement circuit, and signal processor were well-known components of conventional laser-induced testing systems.  The patent examiner identified each of these elements in the Horn reference that he relied upon to reject the claims in the initial Office Action.  Ex. 1 at 60-68.  In response, the inventors did not dispute that these elements were disclosed in the Horn reference or otherwise known in the prior art.  *Id.* at 87-91.  The inventors distinguished Horn **only** because it did not teach accumulating and processing a plurality of data samples.  *Id.* at 88.

1    DATED: May 23, 2019                    Respectfully submitted,

2                                           QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
3

4                                           By    /s/ David Eiseman
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Joseph Leroy, certify that pursuant to Local Rule 5-5, counsel of record who have consented to electronic service are being served on May 23, 2019 with copies of the attached document(s) via the Court's CM/ECF system, which will send notification of such filing to counsel of record.

DATED: May 23, 2019

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By   _/s/ Joseph Leroy_ _____